ORDER DENYING PARTIAL SUMMARY JUDGMENT ON ANTITRUST TYING CLAIMS
 

 OWENS, District Judge.
 

 Plaintiffs filed this lawsuit against International Dairy Queen, Inc. (“IDQ”) and American Dairy Queen Corporation (“ADQ”) seeking injunctive and declaratory relief and monetary damages. By order entered August 30, 1996, the court certified a class action consisting of two classes and three subclasses of holders of Dairy Queen franchises.
 

 In Count III of the eight counts set forth in the fourth amended complaint, plaintiffs allege that IDQ/ADQ have violated § 1 of the Sherman Act, 15 U.S.C. § 1, by engaging in an illegal tying arrangement. Defendants filed a motion for partial summary judgment on the antitrust tying issue, on which oral argument has been heard. After carefully considering those arguments, the relevant case law, and the record as a whole, the court now issues the following order.
 

 I. Summary judgment standard
 

 Federal Rule of Civil Procedure (“FED. R.CIV.P.”) 56(c) provides that summary judgment may be entered in favor of the movant where “the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,
 
 *877
 
 show that there is (1) no genuine issue as to any material fact and that (2) the moving party is entitléd to judgment as a matter of law.”
 
 See also Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986);
 
 Irby v. Bittick,
 
 44 F.3d 949, 953 (11th Cir.1995).
 

 Under the first element, the issue must be genuine, and the factual dispute must be material to the outcome of the litigation.
 
 Anderson,
 
 477 U.S. at 248, 106 S.Ct. at 2510. “Materiality” is determined by reference to the substantive law that controls the case.
 
 Id.; Mulhall v. Advance Security, Inc.,
 
 19 F.3d 586, 590 (11th Cir.),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 298, 130 L.Ed.2d 212 (1994). For a question of fact to be “genuine,” the party opposing summary judgment “ ‘must do more than simply show that there is some metaphysical doubt as to the material facts,’ ”
 
 Irby,
 
 44 F.3d at 953 (quoting
 
 Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
 
 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986)) — the evidence must be of such a quality that “a reasonable jury could return a verdict for the nonmoving party. * * * If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.”
 
 Anderson,
 
 477 U.S. at 248, 249-50, 106 S.Ct. at 2510, 2510-11. Only those doubts about facts that are reasonable must be resolved in favor of the nonmovant.
 
 Irby,
 
 44 F.3d at 953 (citing
 
 Browning v. Peyton,
 
 918 F.2d 1516, 1520 (11th Cir.1990)).
 

 The second requirement that the movant be entitled to judgment as a matter of law is satisfied where “the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.”
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once a party has moved for summary judgment and properly supported its motion, the burden shifts to the nonmovant to create, through the evidentiary forms listed in FED.R.CIV.P. 56(c), genuine issues of material fact necessitating a trial.
 
 Celotex Corp.,
 
 477 U.S. at 324, 106 S.Ct. at 2553.
 

 II. Antitrust tying claims
 

 Section 1 of the Sherman Act, 15 U.S.C. § 1, provides in relevant part:
 

 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal.
 

 Plaintiffs allege that defendants have engaged in an illegal tying arrangement in violation of Section 1, whereby the right to buy a Dairy Queen franchise is conditioned upon the requirement that franchisees also purchase products in which defendants have a financial interest. A tying arrangement is an agreement by one party to sell a product (the “tying product”), but only on the condition that the buyer also purchase a different product (the “tied product”) or at least agrees that he will not purchase the product from another supplier.
 
 Northern Pacific Railway Co. v. United States,
 
 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). The essential wrong of a tying arrangement exists in a seller’s misuse of his control over the tying product in order to force the buyer to purchase products that the buyer “either did not want at all, or would have preferred to purchase elsewhere on different terms.”
 
 Jefferson Parish Hospital District No. 2. v. Hyde,
 
 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2, 13 (1984).
 

 A seller is engaged in an invalid tying arrangement when it uses its market power over one product to coerce a consumer to purchase a second product.
 
 Id.
 
 Not all such tying arrangements are illegal, however. In order to violate Section 1, the following elements must be shown:
 

 (1) A tying and a tied product;
 

 (2) Evidence of actual coercion by the seller that in fact forced the buyer to [purchase] the tied product;
 

 (3) That the seller had sufficient market power in the tying product market to force the buyer to accept the tied product;
 

 (4) Anticompetitive effects in the tied market; and
 

 (5) Involvement of a “not insubstantial” amount of interstate commerce in the tied product market.
 

 
 *878
 

 Amey, Inc. v. Gulf Abstract & Title, Inc.,
 
 758 F.2d 1486, 1503 (11th Cir.1985),
 
 cert. denied,
 
 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986), quoting
 
 Yentsch v. Texaco, Inc.,
 
 630 F.2d 46, 56-57 (2d Cir.1980).
 

 If a tying arrangement is deemed illegal per se, plaintiffs need not show an actual anti-competitive effect. A “per se” analysis, however, is confined to “agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.”
 
 Northern Pacific Railway Co. v. United States,
 
 356 U.S. at 5, 78 S.Ct. at 518, 2 L.Ed.2d at 549;
 
 see Thompson v. Metropolitan Multi-List, Inc.,
 
 934 F.2d 1566, 1573 (11th Cir.1991). The legality of tying arrangements which is not illegal per se are governed by a “rule of reason” analysis.
 
 Amey,
 
 758 F.2d at 1503, citing
 
 Jefferson Parish,
 
 466 U.S. at 29, 104 S.Ct. at 1568, 80 L.Ed.2d at 23.
 

 A. Defining the relevant market
 

 Plaintiffs allege that IDQ/ADQ required their franchisees, in order to continue to conduct business in the Dairy Queen system using defendants’ trademarks and business methods, also to purchase from IDQ/ADQ certain food products and supplies on which IDQ/ADQ realized substantial profits. They allege that defendants’ actions violated Section 1 by the use of coercion in order illegally to tie the purchase and/or continued holding of a Dairy Queen franchise (the tying product) to the purchase of supplies and products (the tied products) which franchisees are required to use in their restaurants. Plaintiffs also allege that IDQ/ADQ have sufficient power in the market for Dairy Queen products to enable them to restrain trade and that as a major franchisor with a nationwide franchise system, defendants’ tying arrangement involves a not insubstantial amount of interstate commerce.
 

 The first hurdle which plaintiffs must overcome in defeating defendants’ motion for summary judgment is the production of evidence that defendants possess sufficient market power within a properly defined product market and geographic market to affect competition.
 
 Times-Picayune Publishing Co. v. United States,
 
 345 U.S. 594, 611, 73 S.Ct. 872, 881-82, 97 L.Ed. 1277 (1953). In order to be capable of engaging in an illegal tying arrangement defendants must be found to have “appreciable economic power in the tying product market.”
 
 Eastman Kodak v. Image Technical Services, Inc.,
 
 504 U.S. 451, 464, 112 S.Ct. 2072, 2080, 119 L.Ed.2d 265 (1992). Market power can be inferred if defendants have a predominant share of the relevant market.
 
 Id.
 
 at 464, 112 S.Ct. at 2080-81. In determining whether a defendant possesses market power the fact-finder may also consider “the strength of competition, probable development of the industry, the barriers to entry, the nature of the anti-competitive conduct, and the elasticity of consumer demand.”
 
 Advo, Inc. v. Philadelphia Newspapers, Inc.,
 
 854 F.Supp. 367, 374 n. 25 (E.D.Pa.1994).
 

 In order to determine whether IDQ/ ADQ have sufficient market power to support a claim under the Sherman Act, it is essential first to define the relevant market.
 
 Allen-Myland, Inc. v. International Business Machines Corp.,
 
 33 F.3d 194, 200 (3rd Cir.1994);
 
 U.S. Anchor Manufacturing, Inc. v. Rule Industries, Inc.,
 
 7 F.3d 986, 994 (11th Cir.1993),
 
 cert. denied,
 
 — U.S. -, 114 S.Ct. 2710, 129 L.Ed.2d 837 (1994). Tying arrangements are illegal only if a seller is able to “exploit[] his dominant position in one market to expand his empire into the next.”
 
 Times-Picayune,
 
 345 U.S. at 611, 73 S.Ct. at 882. Defendants contend that the relevant market for antitrust analysis consists of all fast-food sandwich franchises, of which Dairy Queen attracts approximately 2.5 percent of the retail sales from the available fast food customers. If defendants’ definition of the relevant market is correct, then plaintiffs’ allegations of a tying arrangement must fail since a 2.5-percent market share is not a dominant position in the market and cannot constitute sufficient market power to sustain a claim of antitrust damage.
 
 See Jefferson Parish,
 
 466 U.S. at 12, 104 S.Ct. at 1558.
 

 
 *879
 
 Plaintiffs’ position is that the applicable tying market is limited to the market for soft-serve ice cream franchises and that the applicable market for the tied product consists of food products and supplies which are sold to the Dairy Queen franchises. They argue that the primary product line which identifies a Dairy Queen franchise, and which differentiates it from other fast-food franchises, consists of various soft-serve ice cream creations. The first Dairy Queen store, which opened in 1940, sold only ice cream. The Brazier sandwich product line did not become available to Dairy Queen franchisees until 1968, and some Dairy Queen stores even today offer only soft-serve ice cream products. Plaintiffs offer as evidence of their proposed market definition a study reported in the January 1995 issue of
 
 Entrepreneur
 
 magazine, which rated the Dairy Queen franchise system as the largest soft-serve ice cream franchise opportunity in 1995. The only two other systems identified in the study which are soft-serve ice cream franchises are Carvel Ice Cream, with 502 franchisee-owned stores, and Boy Blue of America, with nine franchisee-owned stores. According to the
 
 Entrepreneur
 
 study, Dairy Queen enjoys 91.8 percent of this market. If the tying market is limited to the soft-serve ice cream franchisees as plaintiffs urge, defendants’ large share of such market would support plaintiffs’ claim that IDQ/ADQ enjoys sufficient market power to affect competition and to sustain a claim of antitrust damage.
 

 Defendants argue that it is unrealistic to define the relevant market as narrowly as urged by plaintiffs because all fast-food franchisors are in competition with Dairy Queen for the same customers. They show that the Dairy Queen/Brazier stores operated by plaintiffs have menus similar to those of other fast-food “sandwich” franchises. In addition, defendants point out that soft-serve ice cream machines are widely available on the market for use in sandwich-type franchises. Thus, defendants argue that the fact that any fast-food outlet is able to offer soft-serve ice cream on its menu precludes a finding that soft-serve ice cream franchises can constitute a separate market for purposes of antitrust analysis. As evidence that soft-serve ice cream franchises should not constitute a separate market, defendants have produced evidence that all the Dairy Queen/Brazier stores operated by the five named plaintiffs in fact sell more hot food and drinks than they do soft-serve ice cream products. This is countered by affidavit evidence offered by plaintiffs showing that in most stores serving both soft-serve ice cream and sandwiches, ice cream products account for more than fifty percent of the sales volume. Plaintiffs also point out that more than half the national menu items which IDQ/ADQ requires the franchisees to carry are Dairy Queen soft-serve ice cream items.
 
 [1]
 
 Plaintiffs also dispute figures and sales statistics which defendants have offered to demonstrate that the named plaintiffs realize more profit from the sale of sandwiches and beverages than they do from the various ice cream products sold in the stores. Plaintiffs contend that defendants’ figures are misleading because they do not represent the documented nationwide average for all Dairy Queen franchisees. Further, they argue that defendants’ sales statistics arbitrarily combine beverage sales with sandwich sales in calculating their comparative profits, even though IDQ itself combines beverage sales with soft-serve ice cream products when it audits the franchises. Plaintiffs also claim that the franchisees’ profit margin on soft-serve ice cream products is substantially higher than their profit margin on sandwiches.
 

 As a further reason for their rejection of IDQ/ADQ’s definition of the relevant market, plaintiffs argue that there is little cross-elasticity of demand or interchangeability among all fast-food franchisees. The concept of “cross-elasticity of demand” means that another product exists which may serve as a substitute for the product in question so that if the price of one product is increased consumers could turn to the other product as a
 
 *880
 
 substitute. In such a situation, the competing products are considered “reasonably interchangeable.”
 
 United States v. Aluminum Company of America,
 
 377 U.S. 271, 276-77, 84 S.Ct. 1283, 1287-88, 12 L.Ed.2d 314 (1964). In analyzing a tying claim, “[t]he circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn; in technical terms, products whose ‘cross-elasticities of demand’ are small.”
 
 Omni Outdoor Advertising, Inc. v. Columbia Outdoor Advertising,
 
 891 F.2d 1127, 1141-42 (4th Cir.1989), quoting
 
 Times-Picayune,
 
 345 U.S. at 612 n. 31, 73 S.Ct. at 882 n. 31,
 
 rev’d on other grounds sub nom. City of Columbia v. Omni Outdoor Advertising, Inc.,
 
 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991). Defining a relevant product involves the identification of products which have actual or potential ability to take significant amounts of business from each other.
 
 U.S. Anchor,
 
 7 F.3d at 994.
 

 Plaintiffs argue that if IDQ/ADQ’s market definition were correct the evidence should show, for example, that as the cost of a McDonald’s franchise increases prospective franchisees seek to become Burger King franchisees. In fact, according to the
 
 Entrepreneur
 
 study, although the cost for a McDonald’s franchise is four times higher than that for a Burger King franchise, there are sixty-two percent more McDonald’s franchised units than Burger King units. Thus, plaintiffs argue that even though consumers may consider fast-food units to be interchangeable, prospective franchisees do not.
 

 Although the lack of interchangeability between fast-food franchises in general provide sufficient evidence in plaintiffs’ view to support a market definition limited to soft-serve ice cream franchises, plaintiffs also offer the alternative theory that soft-serve ice cream franchised units constitute a submarket existing within the broader market of all fast-food franchised outlets. The boundaries of a relevant submarket of a larger market “may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product’s peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.”
 
 U.S. Anchor,
 
 7 F.3d at 995, quoting
 
 Brown Shoe Co. v. United States,
 
 370 U.S. 294, 325 & n. 42, 82 S.Ct. 1502, 1523-24 & n. 42, 8 L.Ed.2d 510 (1962). Plaintiffs argue that the practical indicia in this case raise a genuine issue of material fact as to whether soft-serve ice cream franchise systems constitute a sub-market of all fast-food franchises based on their following characteristics: (1) unique product mix, with more than fifty percent of sales coming from soft-serve ice cream; (2) the use of proprietary formulas; (3) the generation of significantly higher profit margins for soft-serve ice cream than for sandwiches; (4) attraction of a distinct group of customers; and (5) operation of a highly seasonal business, with sales generally being higher during spring and summer months.
 

 Although there is no doubt that overlap exists between the products sold by the Dairy Queen franchisees and those sold by other fast-food franchisees, plaintiffs argue that the distinct product mix of Dairy Queen stores and the peculiar qualities of both the product and its customers present characteristics not necessarily typical of a fast-food franchisor who installs a soft-serve ice cream machine to supplement his primary sandwich business. The fact that plaintiffs depend on profits from both ice cream and sandwiches would not foreclose a rational trier of fact from finding in their favor on the question of the proper definition of the relevant tying market for antitrust analysis. In this case there is evidence to support plaintiffs’ claim that the relevant market is limited to soft-serve ice cream franchises or is at least a submarket of the larger market for fast-food franchises as well as evidence in favor of defendants’ claim that the relevant market consists of all fast-food franchises.
 

 B. Evidence of coercion
 

 The franchise agreements defendants entered into with the Dairy Queen franchisees obligate the franchisees to sell only those products approved by ADQ and to purchase products only from suppliers which ADQ has approved. Defendants insist that franchisor approval of products and suppliers
 
 *881
 
 used in franchised outlets is “widely, if not universally, embodied in franchise agreements and is central to the existence and maintenance of the franchise relationship.”
 
 Fast Food Fabricators v. McDonald’s Corp.,
 
 1980-2 Trad.Cas. (CCH) ¶ 63,552 at p. 76,947 (N.D.Cal.1980). However, an approved source requirement can constitute an illegal tie if a franchisee is coerced into buying products from a company in which a franchisor has a financial interest.
 
 Midwestern Waffles, Inc. v. Waffle House, Inc.,
 
 734 F.2d 705, 712 (11th Cir.1984).
 

 In the present case it is undisputed that IDQ/ADQ makes substantial profits on the sale of equipment, products, and supplies which they purchase for resale to authorized warehouses for sale to the franchisees. IDQ/ ADQ also profit from items they sell directly to franchisees, such as uniforms, premiums, insurance, financing services, equipment, signage, and soft-serve ice cream mix.
 
 [2]
 
 In addition, IDQ/ADQ charge a fee of one half of one percent to the warehouses on every sale of any product to a Dairy Queen franchise. This fee is charged to the authorized warehouses even on sales of products which have been enforced by the Dairy Queen Operators’ Cooperative (“DQOC”)
 
 [3]
 
 and purchased by the warehouse directly from a DQOC-endorsed manufacturer rather than from IDQ. According to IDQ, this fee is charged for advice and information it provides the warehouse concerning lists of Dairy Queen stores, promotional activities, opportunity to purchase IDQ products, and so forth. Because of the various profits and fees which IDQ/ADQ realize on the sale of required products to franchisees, it is clearly in the financial interest of IDQ/ADQ that the franchisees purchase their products directly from the company or from company-authorized warehouses rather than from alternative sources.
 

 The evidence shows that Dairy Queen franchisees purchase ninety-seven different products for which IDQ/ADQ have established detailed specifications, and IDQ/ADQ have also retained the right to establish specifications for other products. Each Dairy Queen franchise agreement provides that the “Franchisor [is] to consider requests of Licensee for approval of specific alternate sources of supply and to cooperate with Licensee in this regard.” Defendants state that except for the special procedure established for cold-drink cups and lids, franchisees are free to make a written request for approval of additional manufacturers for any approved products. They maintain that ADQ will then provide the requested manufacturer with specifications or standards for the product and will evaluate samples to determine whether the manufacturer’s specific product conforms with ADQ’s standards. Defendants state that DQOC has used ADQ’s product approval procedures successfully to obtain approval of different categories of products as recently as within the last few years. Defendants further point out that the 1991 Dairy Queen Uniform Franchise Offering Circular (“UFOC”) provides that “neither Franchisor nor any of its affiliates are the only approved supplier of any goods, services or supplies, ... relating to the establishment or operation of the franchised business.”
 

 Plaintiffs contend, however, that in reality IDQ/ADQ have refused to recognize DQOC as an agent of the franchisees who are its members and have refused to consider DQOC’s requests for approval of alternate suppliers, thereby standing in the way of
 
 *882
 
 rather than cooperating with the franchisees’ efforts to obtain alternative sources of supply and more favorable prices. Plaintiffs allege that the result of defendants’ reluctance to approve additional sources of supply is that Dairy Queen franchisees pay supra-eompetitive prices for IDQ/ADQ-authorized food products and supplies that IDQ/ADQ sell to authorized warehouses and that these prices exceed the prices charged by alternative suppliers which DQOC has endorsed. For instance, plaintiffs state that they are forced to pay higher prices for brand-name Oreo or Hydrox cookies than those franchisees operating under agreements with a territory operator, who are able to use similar cookies without a nationally known brand. However, plaintiffs indicate that in every instance where competition exists because DQOC has been able to enter the market, the result of the competition has been a reduction in prices that the franchisees must pay for food products and supplies. As one example, plaintiffs show that IDQ lowered its price for chocolate topping after Lyons-Magnus became the DQOC-endorsed supplier and offered its toppings for sale at a lower price than IDQ.
 

 Plaintiffs also contend that IDQ/ADQ’s approval process for alternative suppliers is futile and that IDQ/ADQ has discouraged prospective alternative suppliers by providing incomplete product specifications or by imposing unnecessary demands. Although defendants’ UFOC stated between the years 1974 and 1992 that they would provide detailed product specifications to franchisees, plaintiffs insist that they have in fact only permitted franchisees to inspect the detailed product specifications to verify their existence. Instead of providing detailed specifications to prospective suppliers, IDQ/ADQ has offered to provide “summary specifications” which, according to plaintiffs, contain insufficient information to enable a manufacturer to produce a product which meets IDQ/ ADQ’s specifications. As examples, plaintiffs show that Cargill Meat tried for almost three years to produce satisfactory hamburger patties while using the specifications defendants provided and that the approval process for chicken strips produced by Gol Pak took more than two years.
 

 In addition, plaintiffs allege that defendants’ requirement that the Dairy Queen logo be used on various plastic items and products prohibits the franchisees from using less expensive generic or non-logoed products which could be purchased from suppliers not affiliated with defendants. Defendants maintain the logo requirement despite the fact that they have permitted Dairy Queen franchisees in Texas (who are not involved in this lawsuit) to purchase non-logoed products. As a result of the requirement that they use logoed products, plaintiffs contend that prospective suppliers are discouraged from entering the market because it is not feasible for them to invest the time and money to produce the logos while risking the possibility that IDQ/ADQ may change their logos, graphics, or configuration of products at any time. The likelihood of IDQ/ADQ’s affecting competition by enacting a change in logos is demonstrated by the fact that after approving Artistic Carton as an alternative supplier of cake boxes in October of 1995 after a one-year approval process, IDQ informed that company in February of 1996 that IDQ had made changes to the structures and graphics of the cake boxes which would require further testing. Although IDQ/ADQ had presented the proposed new graphics for cups and cake boxes to the National Dealer Marketing Council and the Territory Operators Advisory Council in 1993, Artistic Carton was not notified about their intention to implement the changes until after the completion of the approval process.
 

 In a similar vein, plaintiffs show that in September of 1991 IDQ/ADQ informed Lyons-Magnus, which had packed ice cream toppings for the Dairy Queen system for several years, that it would not be permitted to pack for the IDQ label after November of 1991. Defendants insisted on a complete retesting of the Lyons-Magnus toppings in order to approve that company’s continuing to pack under the Crown Select label. Defendants withheld approval of the toppings for several months after IDQ’s own laboratory reports had confirmed that the topping met its specifications. Moreover, IDQ initially refused to approve the Crown Select labels even though the labels did not mention IDQ,
 
 *883
 
 ADQ, or Dairy Queen. Plaintiffs state that when DQOC directed Lyons-Magnus to make the toppings available to franchisees without the IDQ-approved labels, IDQ-authorized warehouses refused to stock the toppings for fear that IDQ would terminate their contracts if they did so. Nevertheless, the eventual availability of the Crown Select label toppings to franchisees at a lower price resulted in IDQ’s substantially reducing its own topping prices.
 

 Defendants rely upon the case of
 
 Queen City Pizza, Inc. v. Domino’s Pizza, Inc.,
 
 922 F.Supp. 1055 (E.D.Pa.1996) as authority for the proposition that an illegal tying arrangement cannot exist as a matter of law between a franchisor and its existing franchisees. In
 
 Queen City,
 
 franchisees of Domino’s Pizza filed a complaint alleging that Domino’s had violated §§ 1 and 2 of the Sherman Act and had engaged in illegal tying. Ruling for the defendants on a motion to dismiss, the court concluded that an antitrust analysis must take place at the pre-contract stage rather than at the post-contract stage, and that “allegations of wrongdoing in the post-contractual setting implicate principles of contract, and are not the concern of the antitrust laws.”
 
 Id.
 
 at 1062. The court held that market power as it relates to franchises may be defined only by the extent to which a franchisor is able to force a potential franchisee to purchase a tying product (its own franchise) rather than to purchase a competing product (another franchise).
 
 Id.
 
 at 1062.
 

 This court declines to accept the view of the
 
 Queen City
 
 court that franchisees under an existing franchise agreement cannot under any circumstance demonstrate the existence of an illegal tying arrangement. For example, defendants have relied on another franchisor/franchisee case,
 
 Little Caesar Enterprises, Inc. v. Smith,
 
 895 F.Supp. 884 (E.D.Mieh.1995), to support many of their arguments. The court in
 
 Little Caesar,
 
 although ruling for the franchisor, did not foreclose the possibility that the franchisees could have produced sufficient evidence of coercion to demonstrate the existing of a tying arrangement. Further, in
 
 Midwestern Waffles
 
 the Court stated that antitrust tying may be demonstrated in the franchisor-franchisee context when the plaintiff offers sufficient evidence of net economic injury as a result of the tied products being overpriced and of alternative sources of comparable products which would have been available but for the alleged tie.
 
 Id.
 
 at 719. Although the court ruled for the defendants under the facts of that case, it did not foreclose a finding in favor of injured franchisors in a case where sufficient evidence of antitrust injury is produced.
 

 Moreover, “power gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to liability ‘if a seller exploits his dominant position in one market to expand his empire into the next.’ ”
 
 Eastman Kodak,
 
 504 U.S. at 479 n. 29, 112 S.Ct. at 2089 n. 29, quoting
 
 Times-Picayune,
 
 345 U.S. at 611, 73 S.Ct. at 881-82. In
 
 Eastman Kodak
 
 the Supreme Court ruled that once a consumer had purchased a Kodak copier he was “locked in” to purchasing unwanted service agreements because of the continuing need for parts and the high cost of switching to another brand of copier.
 
 Id.,
 
 504 U.S. at 481, 112 S.Ct. at 2089-90. Plaintiffs have shown that Dairy Queen franchisees make significant initial investments in their franchises, which also provide them the option to open additional stores without paying another franchise fee. In addition, IDQ/ADQ can terminate or refuse to renew a franchise agreement if a franchisee fails to carry the full authorized menu of food products or does not meet quality standards. Because of the excessive costs and potential losses associated with purchasing another franchise, a Dairy Queen franchisee wishing to obtain products and supplies from alternative sources at lower costs may be locked in to the existing arrangement enjoyed by IDQ/ADQ. Based upon these cases, the court finds that plaintiffs have produced sufficient evidence of economic loss, overpriced products, and refusal to consider alternative sources of comparable products to preclude the entry of partial summary judgment based on the existence of a franchisor-franchisee relationship.
 

 III. Conclusion
 

 For the reasons stated hereinabove, the court concludes that there exist genuine is
 
 *884
 
 sues of material fact as to the definition of the relevant market for consideration of plaintiffs’ tying claims, and as to whether defendants have exercised market power in the relevant market to coerce plaintiffs into buying food and supplies on which defendants profit and which plaintiffs would have preferred to purchase at lower prices in the open market. Issues of fact also remain as to whether the alleged coercion manifested itself by defendants’ discouraging the entry of other manufacturers into the market by changing company logos without advance notice, imposing unreasonable demands on potential suppliers, and refusing to approve favorably priced potential suppliers for reasons unrelated to product quality. There are also issues of fact whether defendants rendered the product approval process futile by refusing to consider requests for alternative suppliers and by refusing to make detailed product specifications available to franchisees to enable them to locate other potential suppliers. Therefore, based upon these considerations, defendants’ motion for partial summary judgment will be, and is, DENIED.
 

 [1]
 

 . Appendix “B” to plaintiff Collins’ franchise agreement lists at least sixteen required soft-serve items but only the following six required Brazier food items: (1) homestyle hamburgers, (2) hot dogs, (3) fish fillet sandwich, (4) chicken breast fillet sandwich, (5) french fries, and (6) onion rings.
 

 [2]
 

 . IDQ’s Annual Report for 1994 shows that for the year ended November 30, 1994, IDQ received total net income (after income taxes) of $31,420,-899. Of that total $26,391,281 represents IDQ’s before-tax profit on net sales, based upon 1994 net sales of $268,804,179 offset by sales costs of $242,412,898. For the year ending November 30, 1993, the Annual Report shows total after-tax net income of $29,887,693. Of that total $24,-456,868 represents IDQ’s before-tax profit on net sales, based upon 1993 net sales of $241,611,862 offset by sales costs of $217,154,994. For the year ending November 30, 1992, the Annual Report shows total after-tax net income of $29,094,-668. Of that total $24,456,868 represents IDQ’s before-tax profit on net sales, based on 1992 net sales of $228,051,236 offset by sales costs of $204,649,409.
 

 [3]
 

 . The Dairy Queen Operators’ Cooperative is a Minnesota corporation organized as a purchasing cooperative for the benefit of Dairy Queen franchisees and store owners. In addition, the Dairy Queen Operators' Association is a not-for-profit Minnesota corporation of Dairy Queen and Dairy Queen/Brazier franchisees.