Hugh COLLINS, et al., Plaintiffs,

v.

INTERNATIONAL DAIRY QUEEN,
et al., Defendants.

No. 5:94–CV–95–4–MAC(WDO).

United States District Court,
M.D. Georgia,
Macon Division.

March 31, 1999.

William Camp Harris, John Elvis James, Lisa Neill-Beckmann, Macon, GA, Diane Green Smith, Chicago, IL, Lee Abrams, Chicago, IL, for Hugh Colins, Max Collins, Matt Mullis and Dairy Queen of Powder Springs, Inc.

William Camp Harris, John Elvis James, Lisa Neill-Beckmann, Macon, GA, Diane Green Smith, Chicago, IL, for T-Jazier, Inc. and Dairy Queen and Brazier of Eastman, Inc.

Emmet J. Bondurant, II, Atlanta, GA, Benjamin M. Garland, F. Kennedy Hall, Macon, GA, William L. Killion, Quentin R. Wittrock, Minneapolis, MN, for International Dairy Queen, Inc. and American Dairy Queen Corporation.

### ORDER

OWENS, District Judge.

This case was previous certified as a class action consisting of three classes and one

subclass. *See Collins v. International Dairy Queen*, 168 F.R.D. 668 (M.D.Ga.1996). Defendants now move for an order of decertification. Both parties have filed voluminous briefs on the appropriateness of class action treatment. The court has carefully reviewed and considered all the arguments advanced by the parties and has finally determined that decertification is not required. There follows below a brief review of the thrust of many of defendants' arguments to the contrary, along with the reasoning resulting in the denial of defendants' motion.[1]

Defendants assert that decertification is required by FED.R.CIV.P. 23(b)(3), which provides for certification of a class only upon a finding by the court:

> that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

They argue that decisions of the Eleventh Circuit reversing class certification on the basis of Rule 23(b)(3) considerations in *Andrews v. AT & T*, 95 F.3d 1014 (11th Cir. 1996), and *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999 (11th Cir.1997), require decertification of the classes in the present case.

In *Andrews*, the Eleventh Circuit found that the district court's certification of a class was an abuse of discretion. *Andrews* contained issues pertaining to hundreds of telephone 900–number programs that the court found would have to be individually examined to determine whether each was in violation of state gaming laws. Additionally, a resolution of the case would require that gaming laws of all 50 states be interpreted and assessed, and that each of the millions of class members individually prove reliance, causation and damages. *Andrews*, 95 F.3d at 1023–1025. The Court quoted favorably from *Windham v. American Brands, Inc.*, 565 F.2d 59, 70 (4th Cir.1977), the principle that while a district court "should not decline to certify a class because it fears that insurmountable problems may later appear," if the court finds "that there are serious problems now appearing, it should not certify the class merely on the assurance ... that some solution will be found." Accordingly, the *Andrews* court determined that the district court had underestimated the difficulties in management that would be involved in treating the case as a class action.

In *Jackson v. Motel 6*, the Eleventh Circuit made a similar determination that certification of a class was erroneous because the case contained "highly case-specific factual issues" that would involve "distinctly case-specific inquiries into the facts surrounding each alleged incident of discrimination" involving each class member who was allegedly denied a room because of his race.[2] 130 F.3d at 1006.

The holdings in *Andrews* and *Jackson* do not require that defendants' motion be granted. Those two cases required the proof of "highly case-specific factual issues" that the Court found to predominate over any common issues. In contrast, the instant case involves a manageable number of franchisees who operate under franchise agreements with defendants. Although the franchise agreements are not identical in every respect, there are facts in common between all class members pertaining to the issues

1. The issue of decertification as to plaintiffs' claims that defendants have breached a fiduciary duty to the franchisees has not been considered in deciding the present motion. The fiduciary claims are the subject of defendants' separate motion for partial summary judgment, and the arguments made herein will be addressed, if necessary, in a separate ruling on that motion.

2. Defendants also argue that decertification is required by *Broussard v. Meineke Discount Muf-*

*fler Shops, Inc.*, 155 F.3d 331 (4th Cir.1998). The *Meineke* court observed that plaintiffs were attempting to litigate on behalf of a " 'perfect plaintiff' pieced together for litigation." This court finds that the facts herein are not sufficiently similar to those in *Meineke* to require an order of decertification, and that the concerns expressed by the *Meineke* court are not predominant in this case.

herein. Additionally, the evidence to be presented at trial will focus upon the actions of defendants which gave rise to alleged antitrust and contractual violations. These actions engaged in by the defendants are "common to the members of the class [and] predominate over any questions affecting only individual members."

■ With respect to plaintiffs' claims that defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by engaging in an illegal tying arrangement, defendants strenuously argue that under the "net economic loss rule" it is not sufficient for a franchisee to prove merely that he was overcharged for a product he was coerced into buying from the franchiser. He must instead show, according to defendants, that his individual Dairy Queen business suffered a net economic loss on the combined value of both the tied product (products used in the stores) and the tying product (the franchise itself). *See United States Steel Corp. v. Fortner Enterprises, Inc.,* 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977); *Kypta v. McDonald's Corp.,* 671 F.2d 1282, 1285 (11th Cir.), *cert. denied,* 459 U.S. 857, 103 S.Ct. 127, 74 L.Ed.2d 109 (1982); *Midwestern Waffles, Inc. v. Waffle House, Inc.,* 734 F.2d 705, 712 (11th Cir.1984). Defendants argue that net economic loss is an individual issue that must be proved separately for each franchise for various reasons: plaintiff class members did not pay the same amounts for their franchises, their volume of gross sales and annual profits varies greatly, the amount of each allegedly tied product purchased varies from franchise to franchise, and the prices of both the allegedly tied products and the comparable products that the franchisees might have otherwise purchased are not uniform nationwide. However, plaintiffs point out a distinction between the cases defendants cite and the facts in the present case: in defendants' cases either the original agreement included prices for both the alleged tying and tied products *(Kypta),* or the franchisees may be presumed to have known the cost of the tied products (vending services and equipment) in that they were acquired as part of the initial franchise transaction *(Waffle House).* In the case *sub judice,* the franchise agreements do not establish a price for the tied products. Moreover, plaintiffs have focused on defendants' allegedly anticompetitive conduct undertaken subsequent to the signing of the franchise agreements and in violation of the agreements. Thus plaintiffs argue, and the court agrees, that the factual framework of this case is closer to that in *Eastman Kodak Company v. Image Technical Services, Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

In *Kodak,* independent service organizations that serviced Kodak equipment were financially damaged when Kodak began to limit the sale of necessary replacement parts to those equipment buyers who agreed to use Kodak service or repair their own machines. The Supreme Court rejected Kodak's arguments that it would be unable to raise prices of service and parts above that of a competitive market because any increase in profits from parts and service would result in lower profits for equipment. The Court reasoned that Kodak's theory would only be viable if consumers could inform themselves at purchase of the combined costs of equipment, service, and parts. 504 U.S. at 473, 112 S.Ct. 2072. Because this information was difficult or impossible to obtain at the time of purchase, it would not be assumed that consumers had the ability to make an accurate assessment of the total cost over the machine's lifetime. *Id.* at 476, 112 S.Ct. 2072. A similar situation exists here: potential Dairy Queen franchisees would not be in a position to determine the total cost of the tying and tied products if, as plaintiffs allege, defendants violated the franchise agreements by charging supracompetitive prices for the tied products after the agreements were entered into.

Plaintiffs propose to supply common proof of franchisees' net economic losses by demonstrating that their profits have been lower than they would have been were it not for defendants' conduct, the amount of the injury being the amount of the overcharge as compared with what the franchisees would have

paid in a competitive market. As for proof of damages, plaintiffs emphasize that their principal focus will be on those products for which defendants have developed specifications and charged supracompetitive prices, such as toppings, cups and lids, cartons, hamburger patties, and chicken strips. Plaintiffs also propose to use defendants' own documents to establish, on a class-wide basis, the difference between prices at the time that competition existed and at the time they allege that such competition ceased to exist, utilizing expert testimony to prove the minimum amount by which all the franchisees were overcharged. Precedent exists for this method of damages determination, as shown in *In re Domestic Air Transportation Antitrust Litigation*, 137 F.R.D. 677, 692–93 (N.D.Ga.1991), *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 454 (3d Cir.1977), and other cases cited by plaintiffs. Therefore, even though the factual particulars may vary among the franchisees, plaintiffs' proposed method of proof assures that any damages will be assessed only after proof of injury that fully pertains to all class members.

With respect to the issue of proof of coercion, defendants' arguments fail to show convincingly that the court's prior ruling in *Collins v. International Dairy Queen*, 168 F.R.D. 668, 675 (M.D.Ga.1996), was incorrectly decided. Although defendants insist that proof will be required that each class member was individually coerced, the Eleventh Circuit has stated that:

> [T]he courts have never required direct evidence of coercive behavior to prove a tying violation. It is well established that coercion may be established by showing that the facts and circumstances surrounding the transaction as a practical matter forced the buyer into purchasing the tied product.

*Tic–X–Press, Inc. v. Omni Promotions Company of Georgia*, 815 F.2d 1407, 1418 (11th Cir.1987). Plaintiffs' proposal to prove the issue of coercion by evidence that applies uniformly to all plaintiff class members avoids the complexity that would result from requiring individualized proof and is a permissible method of proving coercion. Consequently, this issue does not present an obstacle to continued maintenance of the class action.

Defendants also argue that proof of plaintiffs' *Kodak* lock-in theory turns on numerous individual issues, such as pre-investment information costs and "switching costs," that cannot be decided on a class-wide basis. Because both the sources and amount of information available to franchisees varied at the time their decision was made to invest in a franchise, defendants argue that proof would vary as to each individual franchisee as to whether he could have anticipated a subsequent restriction of his choice of suppliers. Also, defendants point out that many franchisees who opened multiple franchises over a period of years were thoroughly familiar with the business before opening additional stores. Defendants assert that franchisees are not locked in or prevented from leaving the Dairy Queen system by switching costs, as the purchasers of copiers were argued to be in *Kodak*. In the limited instances when this may be true, they argue that each such instance must be proved on an individual basis.

To counter defendants' arguments, plaintiffs state that they propose to offer class-wide proof demonstrating that regardless of the date a class member acquired his franchise, franchisees did not become aware until the time period of 1991–1994 that they were paying higher prices as the result of defendants' failure to approve alternative suppliers. As for proof of switching costs, plaintiffs emphasize the presence of non-compete clauses in the majority of the franchise agreements that would require a franchisee to change professions or work on a different geographic area if defendants should exercise their right to terminate a franchisee for using non-approved products.

■ There are undoubtedly significantly varying factual details pertaining to the level of information obtainable by each potential franchisee at the time of signing his franchise agreement. However, these individual variations do not override the common questions

relating to information and switching costs. The court finds that consideration of these issues does not require individualized proof to the extent argued by defendants. Further, the court finds that the method and limited time frame plaintiffs have proposed for their attempt to show class-wide costs is reasonable. Thus, defendants' concerns relating to information and switching costs do not warrant decertification.

■ Defendants argue that proof of the relevant market under the Section 1 tying claim requires individualized proof relating to the relevant market for the tying product, this proof consisting of evidence of the market conditions that existed at various points in time over the past 40 years when each individual class· member· made a decision to invest in a Dairy Queen franchise. They also claim that the Section 2 monopolization claims will require plaintiffs to prove the relevant market for each of the more than 100 different products that they contend defendants have monopolized or attempted to monopolize. However, it has not been demonstrated to the court's satisfaction that proof of defendants' market power in the appropriate market will depend on individualized testimony from the standpoint of each plaintiff franchisee. Rather, this factual determination should be ascertainable from more generalized proof, as is generally the case in antitrust cases. Plaintiffs have alleged a single relevant market consisting of products sold to Dairy Queen franchises outside of Texas, rather than a separate product market for each individual product. This market definition is not contrary to accepted market definitions in other antitrust cases where the separate products that were part of the defined market were not all identical. *See, e.g., Kodak,* 504 U.S. at 480–82, 112 S.Ct. 2072; *Sollenbarger v. Mountain States Telephone and Telegraph Co.,* 121 F.R.D. 417 (D.N.M.1988). The fact that numerous individual products are to be found within the proposed market definition will not, in the court's view, require the factfinder to define an equivalent number of separate markets, nor does this fact defeat the propriety of class certification.

■ Defendants further argue that individual questions preclude class treatment of the breach of contract claims relating to the product approval process. Many of the franchise agreements make no reference to a franchisee's right to request approval for alternative sources of products; thus, defendants claim that a breach of contract claim cannot be maintained on behalf of such a franchisee. However, plaintiffs argue that the overwhelming majority of contracts have an alternative supplier provision even though a few agreements do not contain clauses pertaining to requests for alternative product suppliers. Given the predominance of the common issue of a right to alternative suppliers, the variation in contract language is insufficient to require decertification.

Defendants further claim that the breach of contract claims cannot be considered as to each class member without first finding whether that member first submitted a written request for alternative product approval. Plaintiffs argue that proof of individualized requests is not needed because the franchise agreements do not require each individual franchisee to submit a written request for product approval. Instead, plaintiffs indicate that every time a request for an alternative supplier has been made, it has been submitted on behalf of the franchisees by the Dairy Queen Operators' Association ("DQOA") and/or the Dairy Queen Operators' Cooperative ("DQOC"). Plaintiffs propose to prove their breach of contract claims by focusing on defendants' conduct with respect to rejection of proposed alternative suppliers that were requested either by or on behalf of the franchisees. In the event that either the failure of individual franchisees to seek an alternative supplier or differences in contract language should create an insurmountable obstacle to resolution of issues relating to the breach of contract claims, the court retains the discretion to create separate classes or subclasses or to redefine appropriate classes. Thus, decertification of the case with respect to the breach of contract claims is not required.

In summary, the court finds the presence of individual issues in this lawsuit does not

694

outweigh the claims common to all class members. Because such common issues clearly predominate, maintenance of a class action is proper. Moreover, the court finds that maintenance of this class action is the superior method for adjudicating the controversy between the parties, in that it represents an efficient use of judicial resources and avoids the potentially large number of individual lawsuits that could result from a ruling requiring each franchisee to adjudicate his claims separately. Defendants' motion for decertification of the class is therefore **DENIED.**