Hugh COLLINS, et al., Plaintiffs,

v.

INTERNATIONAL DAIRY QUEEN,
et al., Defendants.

No. 5:94–CV–95–4 (WDO).

United States District Court,
M.D. Georgia,
Macon Division.

Aug. 5, 1999.

William Camp Harris, John Elvis James, Lisa Neill–Beckmann, Macon, GA, Diane Green Smith, Lee Abrams, Chicago, IL, for Plaintiffs.

Emmet J. Bondurant, II, Atlanta, GA, Benjamin M. Garland, F. Kennedy Hall, Mr., Macon, GA, William L. Killion, Quentin R. Wittrock, Troy A. Bader, Minneapolis, MN, for Defendants.

### ORDER

OWENS, District Judge.

Before the court in this antitrust class action lawsuit is the motion of defendants International Dairy Queen, Inc. ("IDQ") and American Dairy Queen Corporation ("ADQ"), under Fed.R.Civ.P. 12(b)(6), to dismiss Count III of the fifth amended complaint in this antitrust class action entitled "antitrust tying violations." In *Collins v. International Dairy Queen*, 939 F.Supp. 875 (M.D.Ga.1996), this court denied the motion of defendants for partial summary judgment on the tying claims. The present motion is premised upon plaintiffs' failure in their fifth amended complaint to allege a "net economic loss" as required in *Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1285 (11th Cir.), *cert. denied*, 459 U.S. 857, 103 S.Ct. 127, 74 L.Ed.2d 109 (1982).

In *Kypta*, the Court of Appeals held:

[I]njury resulting from a tie-in must be shown by establishing that payments for both the tied and tying products exceeded their combined fair market value. The rationale behind this requirement is apparent: A determination of the value of the tied products alone would not indicate whether the plaintiff indeed suffered any net economic harm, since a lower price might conceivably have been enacted by the franchiser for the tying product. Unless the fair market value of both the tied and tying products are determined and an overcharge in the complete price found, no injury can be claimed; suit, then, would be foreclosed.

*See also Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 712 (11th Cir.1984). The net economic loss theory has been previously discussed by this court in the context of defendants' motion to decertify the class. *See Collins v. International Dairy Queen*, 186 F.R.D. 689 (M.D.Ga.1999). In denying the motion to decertify, the court noted a distinction between the facts in the present case and those in *Kypta* and *Waffle House*, in that in those cases the franchisees either knew or impliedly knew the cost of both the tied and tying products at the time they purchased their franchises. Here, by contrast, plaintiffs allege that most of the class members in this case bought their Dairy Queen franchisees at a time when it was defendants' policy, as set forth in their

Uniform Franchise Offering Circulars, that the franchisees had the right to purchase approved products from any available source and that defendants would not be the franchisees' only source of supply for products. Plaintiffs have produced evidence that beginning in the early 1990's defendants have changed their policy and have begun a course of conduct of unreasonably excluding alternative suppliers from the relevant market, thereby rendering defendant the sole source of most of the approved food products. Plaintiffs claim that the named plaintiffs and other class members are locked in to their franchisees because of the costs of switching to a different franchise, and that they have been coerced into purchasing food and supplies at supracompetitive prices.

Based on plaintiff's theory of damages, the court has concluded that the present case is more similar in its facts to *Eastman Kodak Company v. Image Technical Services, Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), in which the Kodak Company began to limit the sale of replacement parts to those equipment buyers who agreed to use Kodak service or repair their own machines. The Supreme Court rejected Kodak's arguments that it lacked market power in the alleged tying product market of photocopier equipment and that any increase in its profits from parts and service would necessarily result in lower profits for equipment. The Court held, instead, that this theory would be viable only if consumers were informed at the outset of the combined costs of equipment, service, and parts. *Kodak,* 504 U.S. at 473, 112 S.Ct. 2072.

Most of the class members in the present case were unaware when they purchased their franchises that defendants would change their policy and tighten their restrictions on approved products to the franchisees' financial detriment. Logically, it makes little sense to assume that the price paid for a Dairy Queen franchise, years before antitrust injury is alleged to have occurred, bears upon whether a franchisee suffered antitrust injury when he was allegedly later coerced into purchasing

tied products at supracompetitive prices. Nevertheless, *Kypta* holds that in this circuit the value of the franchise license (the tying product) is an element of plaintiffs' proof of antitrust injury and of anticompetitive effects in the tied market (food and supplies). *Kodak* did not specifically discuss the requirements for proof of anticompetitive effects in the tied market but rather held that Kodak's lack of power in the primary equipment market did not as a matter of law preclude the possibility of market power in the aftermarket for servicing the equipment. *Kodak,* 504 U.S. at 455, 112 S.Ct. 2072. Thus, the similarity of this case to the *Kodak* factual scenario does not relieve plaintiffs of the necessity to prove the value of the overall package of franchise and food/supplies in order to show net economic loss.

Plaintiffs have previously proposed to supply common proof of franchisees' economic losses by showing lower profits based on the amount of the overcharge as compared with what they would have paid in a competitive market, using defendants' own documents to establish the difference in prices at the time defendants' changed their policy. They also have proposed to utilize expert testimony to prove the minimum amount that all the franchisees were overcharged. The court has approved these methods for proving the differences in price between the allegedly supracompetitive products and the prices the franchisees would otherwise have been able to pay. Plaintiffs have not indicated, however, how they propose to prove the value of the overall package of the tied and tying products to show that a lower price was not paid for the franchise license to offset supracompetitive prices for the food and equipment.

In their fifth amended complaint plaintiffs make the following allegations that they submit constitute sufficient pleading of net economic loss:

> ¶ 56. Defendants' policy of refusing to approve alternative sources of food products and supplies and of deterring

alternative sources from seeking entry into the Dairy Queen market, has made defendants the sole source of most food products and supplies purchased by the Dairy Queen franchisees.

¶ 58. Defendants' unlawful activities have forced the named plaintiffs and the class members to consume the IDQ-approved food products and supplies, and have caused them to purchase those items at prices that are above competitive levels. Moreover, defendants have engaged in the conduct described in this complaint for the purpose, and with the effect, of foreclosing competition in the relevant market consisting of food products and supplies that are purchased by the Dairy Queen franchisees.

¶ 64. As a consequence of this unlawful tying arrangement and Defendants' other anticompetitive behavior, the named plaintiffs and the class members have suffered economic injury to their businesses in an amount which is presently undetermined.

¶ 35. Defendants have implemented an unreasonable product approval process that reflects a change in their own stated policies regarding the approval of alternative sources.

¶ 35E. By controlling the supply of jacketed cones, and by prohibiting franchisees from using nonjacketed cones, defendants have eliminated the franchisees' ability to buy cones at competitive prices.

¶ 35O. Defendants have unreasonably refused to approve President Baking Company's chocolate sandwich cookie product for Blizzards and, in fact, have threatened to sue President Baking Company. That unreasonable refusal prevents franchisees from realizing substantial cost savings that would result from the purchase of that alternative product.

After carefully considering plaintiffs' allegations and the arguments previously made in this case, the Court must conclude that plaintiffs have failed to sufficiently allege that they have suffered net economic loss as required by *Kypta*. Consequently, plaintiffs will be required to amend their complaint within sixty (60) days to comply with the Eleventh Circuit's requirements as set forth in *Kypta*. Defendants' motion to dismiss Count III of the antitrust tying violations will be DENIED at this time. However, the court will reconsider the motion if plaintiffs fail to adequately amend their complaint.