[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 19, 2002
THOMAS K. KAHN
CLERK

_____

No. 00-16460

_____

D.C. Docket No. 97-00015 CV-OC-10

MARIS DISTRIBUTING COMPANY,
a Florida corporation,

Plaintiff-Appellant,

versus

ANHEUSER-BUSCH, INC.,
a Missouri Corporation,
ANHEUSER-BUSCH COMPANIES, INC.,
a Delaware Corporation, et al.,

Defendants-Appellees.

_____

No. 01-13095

_____

D.C. Docket No. 97-00015 CV-OC-10C

MARIS DISTRIBUTING COMPANY,
a Florida corporation,

Plaintiff-Appellant,

versus

ANHEUSER-BUSCH, INC.,
a Missouri Corporation,

Defendant-Appellee.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

**(August 19, 2002)**

Before ANDERSON, HULL and KENNEDY[*], Circuit Judges.

ANDERSON, Circuit Judge:

Plaintiff Maris Distributing Company (Maris) brought this antitrust action against Defendant Anheuser-Busch, Inc. (Anheuser-Busch), alleging in part that Anheuser-Busch violated §1 of the Sherman Act by prohibiting its distributors from being owned, in whole or in part, by the public. Maris contended that this restriction, contained in Anheuser-Busch's distribution agreements, suppressed the price for equity ownership interests in beer distributorships, and in particular in the

_____

[*]Honorable Cornelia G. Kennedy, U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

submarket of the purchase and sale of ownership interests in Anheuser-Busch beer distributorships. After hearing the evidence at trial, the district court directed a verdict in Anheuser-Busch's favor on the issue of whether Anheuser-Busch had market power, such that there was the potential for genuine anticompetitive effects on competition. However, the court allowed to go to the jury the issue of whether actual anticompetitive effects had been shown by the plaintiff. In response to special interrogatories, the jury then found that Maris had established both a relevant market (the purchase and sale of equity ownership interests in beer distributorships) and submarket (the purchase and sale of equity ownership interests in Anheuser-Busch beer distributorships). However, the jury found that Maris had failed to show actual anticompetitive effects as a result of the public ownership restriction. Maris appeals the district court's directed verdict on the issue of market power as well as several other issues related to the trial. For the reasons that follow, we conclude that the district court's actions were proper, and we affirm.

## I. BACKGROUND

Anheuser-Busch distributes its brands of beer through a network of approximately 700 authorized wholesale distributors, each with an assigned territory. Maris was one of these distributors from 1968-1997 and was Anheuser-

Busch's exclusive distributor for the territory covering Gainesville and Ocala, Florida. Maris paid nothing to Anheuser-Busch in exchange for this distributorship.

The relationship between Anheuser-Busch and each of its distributors is governed by a written contract referred to as the Equity Agreement. Upon becoming a distributor in 1968, Maris agreed as part of the Equity Agreement that Anheuser-Busch had the right to approve any change in Maris's ownership. Less than a year later, in 1969, the Equity Agreement was amended to include a provision that precluded any public ownership (either through sale to a publicly-owned company or via a public offering of stock) of distributorships. It is this provision that is the subject of the instant lawsuit. Maris did not object to the amendment when the provision was added in 1969, and it also signed two subsequent versions of the Equity Agreement – one in 1974 and one in 1982 – each of which contained similar prohibitions against public ownership.

The operative agreement between Maris and Anheuser-Busch at the time this lawsuit was filed was the 1982 Equity Agreement, paragraph 4(i) of which provided:

> Under no circumstances shall Wholesaler or any owner of Wholesaler have the right to transfer any ownership interest in the business of Wholesaler if such transfer would result in Wholesaler being owned in

4

whole or in part, directly or indirectly, by the public.

The Equity Agreement provides, however, that distributors may sell distributorships, including the right to distribute Anheuser-Busch products, to any non-public entities, provided that they seek and obtain Anheuser-Busch's approval. Another provision required the distributor to provide Anheuser-Busch with notice of its intent to sell and to allow Anheuser-Busch to have an exclusive right to negotiate for the purchase of the distributorship for 45 days.

On August 25, 1996, following a meeting with Anheuser-Busch, Maris submitted a "Notice of Intent to Sell," pursuant to the terms of the Equity Agreement. During the subsequent negotiations, Anheuser-Busch made two offers to purchase Maris – one for $20.4 million and one for $21.5 million. Maris did not accept these offers and made no counter-offer.

After the required 45-day negotiation period with Anheuser-Busch, Maris indicated that it would seek to sell the business to a third-party. Maris had discussions with at least six potential buyers, but never submitted a proposed purchaser to Anheuser-Busch. According to Anheuser-Busch, Maris's lack of success in finding a buyer was in part because Maris demanded an unreasonably high price – $60 million –  and because it acted unreasonably in its negotiations with potential buyers. Anheuser-Busch also attributes some of Maris's difficulties

to the fact that it employed a broker, Irvin Philpot, who Anheuser-Busch says was a convicted felon and an otherwise unsavory character.

Maris filed this lawsuit on January 22, 1997, challenging the Equity Agreement's public ownership provision. On March 20, 1997, Anheuser-Busch terminated the Equity Agreement with Maris. Anheuser-Busch ceased selling its products to Maris, and assigned Maris's territories to two other distributors. Maris asserted a Sherman Act §1 antitrust claim,[1] alleging that the public ownership provision effected an unreasonable restraint in trade (in the form of a non-price, vertical restraint) by suppressing prices in the relevant market for the purchase and sale of equity ownership interests in beer distributorships, and in the relevant submarket for the purchase and sale of equity ownership interests in Anheuser-Busch beer distributorships.[2]

Maris's only claim that went to trial in this case was a rule of reason claim

---

[1]Maris also attempted to assert a Sherman Act §1 horizontal restraint claim and a §2 attempted monopolization claim against Anheuser-Busch. The district court dismissed and/or granted summary judgment on those claims, and Maris does not appeal those rulings.

[2]Anheuser-Busch challenged Maris's definitions of the alleged relevant market and submarket. As discussed below, the jury accepted Maris's contentions concerning the relevant market and submarket, and Anheuser-Busch has not appealed those findings. Therefore, we accept for purposes of this appeal Maris's definition of the relevant market and submarket.

under Sherman Act §1, and the parties agree that in order to prevail on its claim, Maris had to prove, inter alia, either that (1) Anheuser-Busch had market power in the relevant market or submarket such that the restraint had potential anticompetitive effects, or (2) the restraint resulted in actual anticompetitive effects on the relevant market or submarket. See Levine v. Central Florida Medical Affiliates, Inc., 72 F.3d 1538, 1551 (11th Cir. 1996).

On the issue of market power, the evidence showed that Anheuser-Busch only owned all or part of 20 out of approximately 700 Anheuser-Busch distributorships[3] and 2700 distributorships of all brands of beer. This indicates that Anheuser-Busch's market share in the alleged relevant market was less than 1%, and that its share of the Anheuser-Busch submarket was still only 2.9%. Nonetheless, Maris argued that it could show market power based on the fact that Anheuser-Busch had a 48% market share in the manufacture of beer.

Despite Anheuser-Busch's small market share in the relevant market and submarket, Maris's experts testified that in the case of vertical restraints, a defendant's market share in manufacturing can result in market power in the

---

[3]The evidence was that Anheuser-Busch owned 12 distributorships outright, and that that number had remained fairly constant over time. Moreover, Anheuser-Busch was a limited partner, through the Anheuser-Busch Investment Capital Corp., in 8 other distributorships ("ABICCs"), but that the number of these ABICCs had decreased over time.

relevant market for the purchase and sale of ownership interests in distributorships. These experts stated that when Anheuser-Busch's market share in the manufacture of beer is taken together with its contractual influence over the valuations and sales of distributors, and the contractual exclusion of all publicly-owned buyers, then it could be shown that Anheuser-Busch had market power over distributors.

Anheuser-Busch disagreed and argued that Anheuser-Busch's small market share in the relevant market precluded as a matter of a law a finding of market power. The district court agreed with Anheuser-Busch and excluded Maris's expert testimony concerning market power, finding as a matter of law that market share could not be imputed to the alleged relevant market for the purchase and sale of equity ownership interests of beer distributorships from the separate market of the manufacture and sale of beer. The district court also agreed with Anheuser-Busch that market power could not be shown by evidence of Anheuser-Busch's influence over entry and exit to the market because, the court found, such evidence only showed contract power and not market power. Therefore, the court also excluded that evidence. After excluding this evidence, and in light of Anheuser-Busch's small market share in the relevant market and submarket, the district court entered a directed verdict in favor of Anheuser-Busch on the issue of market power.

Although the district court directed a verdict on the market power issue, the court allowed to go to the jury the issue of whether Maris nonetheless had proven actual anticompetitive effects as a result of the public ownership restriction. Maris attempted to prove several actual anticompetitive effects, including: 1) the suppression of the price at which beer distributorships are sold, 2) a reduction in output (sales of distributorships) as a result of suppressed price, 3) the creation of barriers to entry into the market, 4) the creation of a barrier to exit the market, and 5) harm to consumers in the form of higher beer prices as a result of decreased competition among distributors.

In its special verdict, the jury found in favor of Anheuser-Busch on the issue of actual anticompetitive effects. Based on this verdict, the district court entered judgment in favor of Anheuser-Busch, and taxed Maris with costs.

## II. ISSUES

Although Maris raises several issues on appeal, only two of those issues merit extended discussion.[4] These are:

---

[4]In addition to the issues discussed in the text, Maris also maintains that it was prejudiced by several rulings by the district court at trial, including allowing Anheuser-Busch to refer to its alleged reasons for terminating Maris's distributorship and allowing Anheuser-Busch to refer to the criminal record of Maris's broker, Irvin Philpot. After careful review of the arguments of the parties and the record as it relates to these issues, we find them to be without merit and we affirm without further discussion.

1.  Whether the district court erred in granting a directed verdict in favor of Anheuser-Busch on the issue of market power, and in excluding related evidence.

2.  Whether the district court abused its discretion by awarding certain costs related to discovery depositions and expedited trial transcripts.

## III.  DISCUSSION

### A.  Directed Verdict on Market Power

Maris's primary claim on appeal is its contention that the district court erred by directing a verdict in Anheuser-Busch's favor on the issue of market power (and

---

Maris also maintains that the district court erred by allowing Anheuser-Busch to cross-examine Maris's expert witnesses concerning the lack of evidentiary support for certain propositions, even though Anheuser-Busch had objected to supplying related information  (mostly related to beer prices and previous sales of Anheuser-Busch distributorships) during discovery based, in part, on relevancy objections.  Maris argues that Anheuser-Busch should have been judicially estopped from taking this approach.  See New Hampshire v. Maine, 532 U.S. 742, 121 S. Ct. 1808 (2001) (discussing factors for judicial estoppel).  For several reasons, we think Maris's argument is without merit.  First, it is clear that Maris was provided with a great deal of the relevant information during discovery and that much of the other data was publicly available to Maris and its experts if they had sought it out.  Second, it does not appear that Anheuser-Busch took positions during the course of the litigation that were "clearly inconsistent," see id. at 1815, just because it originally maintained that certain issues were irrelevant, but then sought to cross-examine Maris's witnesses on those issues after the trial court allowed them to be introduced.  Finally, it appears that Anheuser-Busch's cross-examination on these issues was fair, and that it would have been unfair to deny Anheuser-Busch the opportunity to conduct a thorough cross-examination of Maris's witnesses based on the positions that it took during discovery.  Therefore, we also reject Maris's judicial estoppel argument.

10

excluding related evidence).   Maris argues that the ban on public ownership contained in Anheuser-Busch's distributorship agreements is an unreasonable vertical restraint in violation of §1 of the Sherman Act.  The parties are in agreement that Maris's claim was subject to the "rule of reason," rather than per se antitrust analysis.  In Levine v. Central Florida Medical Affiliates, Inc., 72 F.3d 1538 (11th Cir. 1996), we discussed the legal standards applicable to such a claim:

> Under the rule of reason, the "test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." Chicago Bd. of Trade v. United States, 246 U.S. 231, 238, 38 S. Ct. 242, 244, 62 L. Ed. 683 (1918). Rule of reason analysis requires the plaintiff to prove (1) an anticompetitive effect of the defendant's conduct on the relevant market, and (2) that the conduct has no procompetitive benefit or justification.
>
> In order to prove an anticompetitive effect on the market, the plaintiff may either prove that the defendants' behavior had an "actual detrimental effect" on competition, or that the behavior had "the potential for genuine adverse effects on competition." In order to prove the latter, the plaintiff must define the relevant market and establish that the defendants possessed power in that market.

Id. at 1551 (citations and quotations omitted).  Ultimately, in order to consider a rule of reason claim based on a vertical restraint, we have stated that a court must conduct a "systematic comparison" of the negative effects of the restraint on competition and compare that with the positive effects on competition stemming from the restraint. Id. at 1571.  Graphic Products Distributors v. Itek Corp., 717

11

F.2d 1560, 1571 (11th Cir. 1983)

Maris claimed, and the jury so found, that the relevant product market was the market for the purchase and sale of equity ownership interests in beer distributorships, and that there was a relevant submarket for the purchase and sale of equity ownership interests in Anheuser-Busch beer distributorships. The jury also found that the plaintiff had failed to prove an anticompetitive effect in the form of an "'actual detrimental effect' on competition." See Levine, 72 F.3d at 1551. The only issue before us involves whether the plaintiff made a sufficient showing of market power in the relevant market and submarket to present a triable issue on "the potential for genuine adverse effects on competition." Id.

As Maris points out, "[t]he question of market power is a factual one," and it argues that the question of whether Anheuser-Busch had market power should have been left to the jury. Thompson v. Metropolitan Multi-List, Inc., 934 F.2d 1566, 1580 (11th Cir. 1991). For the reasons that follow, we conclude that the district court was correct in determining that, as a matter of law, Anheuser-Busch was entitled to a directed verdict on the market power issue.

"A district court may enter judgment as a matter of law if a party has been fully heard on an issue and there is no legally sufficient basis for a reasonable jury to find in favor of that party on that issue. When considering such a motion, the

court must evaluate all of the evidence, together with any logical inferences therefrom, in the light most favorable to the nonmoving party." Carter v. Decisionone Corp., 122 F.3d 997, 1003 (11th Cir. 1997). See Fed. R. Civ. P. 50. We review de novo an order directing a verdict. Id. at 1004.

In arguing that the district court erred in directing a verdict on the market power issue, Maris makes three different, but somewhat-related arguments. First, it argues that Anheuser-Busch's market share in beer should have been imputed to the alleged relevant market for the purchase and sale of ownership interests in beer distributorships. Second, it maintains that even if such an imputation is not appropriate, Anheuser-Busch's share of the relevant market should be aggregated with the share held by all other parties to its distributor agreements, including all of Anheuser-Busch's distributors. Finally, Maris contends that the district court erred by finding that certain restrictions imposed by Anheuser-Busch on its distributors evidenced only contract power, and not market power. As we shall explain, we find that none of these contentions has merit.

1. Imputation of Market Share to Relevant Market

As mentioned above, the district court determined, as a matter of law, that Anheuser-Busch did not have market power in the alleged relevant market for the purchase and sale of equity ownership interests in beer distributorships given its

13

market share of 1% - 3% in that market. Maris, however, maintains that Anheuser-Busch's significant market share in the manufacture and sale of beer is sufficient to show market power in the relevant market and submarket. Specifically, Maris contends that "[i]n cases involving vertical restraints imposed by a manufacturer on distributors, market power is determined by reference to the manufacturer's share of products in the market, not its share of ownership in distributors." Maris's Opening Brief, at p. 45. In other words, Maris maintains that a manufacturer's market share in the market for its products should be imputed to the separate market for ownership interests in the manufacturer's distributorships when a provision in the distributorship agreement is challenged. We disagree.

We begin by noting that Maris's position seems to be foreclosed by our precedent, unless Maris is able to show some "connection" between the two different markets that would justify our consideration of Anheuser-Busch's market share in the beer market while considering Maris's claim. In Manufacturing Research Corp. v. Greenlee Tool Co., 693 F.2d 1037 (11th Cir. 1982), we rejected the relevance to an antitrust claim of market power in a market other than the relevant market for the particular claim. In that case, which involved an attempt to monopolize claim, we considered a district court's denial of discovery concerning the defendant's sales of conduit benders in light of the court's finding that the

14

relevant market for the antitrust claims in that case was the market for cable benders. We affirmed the denial of discovery, reasoning that a showing of market power in the cable bender market did not show market power in the relevant market of conduit benders. Id. at 1043. In particular, we noted that this was true because the plaintiff had provided "[n]o proof of any connection between Greenlee's conduct in the conduit bender market and that in the cable bender market." Id. Therefore, we held that a defendant's market share in a market other than the alleged relevant market is irrelevant, and cannot be imputed, at least absent a showing of some "connection" between two different markets that would provide a basis for such an imputation.

We have not been alone in reaching that conclusion. In Intergraph Corp. v. Intel Corp., 195 F.3d 1346 (Fed. Cir. 1999), the Federal Circuit considered a monopolization claim brought by Intergraph against its supplier Intel, a business with a high market share in the market for high performance computer microprocessors. Intergraph alleged in that case that the relevant market for its antitrust claim was the "graphics subsystems" market, a market in which Intergraph and Intel were competitors, but in which neither Intel nor Intergraph had market power. Id. at 1354. In rejecting Intergraph's claim that Intel's role in the microprocessor market supported its claim of monopolization in the graphics

subsystem market, the court stated:

> Intel's market power in the microprocessor market is irrelevant to the issues of this case, all of which relate to the effect of Intel's actions on Intergraph's position in its own markets.

Id. Therefore, the Federal Circuit also declined to impute market share from one market to another for purposes of determining whether a defendant had market power in the second market.

While urging us to accept its position that Anheuser-Busch's market share in the beer market should be imputed to the alleged relevant market for the purchase and sale of equity ownership interests in beer distributorships, Maris primarily relies on two cases – the Supreme Court's opinion in Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 97 S. Ct. 2549 (1977), and our decision in Graphic Products Distributors v. Itex Corp., 717 F.2d 1560 (11th Cir. 1983). Sylvania is the Supreme Court's seminal case concerning vertical, non-price restraints. In that case, the Supreme Court noted as background that:

> The traditional framework of analysis under § 1 of the Sherman Act is familiar and does not require extended discussion. Section 1 prohibits "[e]very contract, combination . . ., or conspiracy, in restraint of trade or commerce." Since the early years of this century a judicial gloss on this statutory language has established the "rule of reason" as the prevailing standard of analysis. Standard Oil Co. v. United States, 221 U.S. 1, 31 S. Ct. 502, 55 L. Ed. 619 (1911). Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.

16

Sylvania, 433 U.S. at 49, 97 S. Ct. at 2557. The Supreme Court then went on to explain that "[t]he market impact of vertical restrictions is complex because of their potential for a simultaneous reduction of intrabrand competition and stimulation of interbrand competition," and that even though such restrictions may reduce intrabrand competition, "[v]ertical restrictions promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products."  Id. at 51-54, 97 S. Ct at 2558-60.  Therefore, the Court held that non-price, vertical restraints are subject to analysis under the rule of reason, rather than to per se treatment.  Id. at 57-59, 97 S. Ct. at 2561-62.

Maris argues that Sylvania supports its position that Anheuser-Busch's market share in the manufacture and sale of beer could show market power over the alleged relevant market for the purchase and sale of equity ownership interests in distributorships because it maintains that Sylvania indicates that it is a manufacturer's market share in manufacturing that is relevant in judging a vertical restraint.  Maris notes that the Supreme Court spoke in terms of the defendant's market share in sales of the manufacturer's end-products. See id. at 38, 97 S. Ct. at 2551 (noting that defendant's market share in sales of televisions increased from 1-2% to 5% following imposition of vertical restraint).

We believe that the difference between Sylvania and the instant case is

patent and significant.  The relevant market involved in <u>Sylvania</u> was the market for television sets.  Therefore, of course the defendant's market share in the manufacture and sale of those products was directly relevant to the issue of whether it had market power in the relevant market.  Nothing in <u>Sylvania</u> offers any support, however, for the notion urged by Maris that in the case of a restraint imposed by a manufacturer on its distributors,  market share may be imputed from one market (<u>i.e.</u>, beer)  to another market (<u>i.e.</u>, equity ownership interests in distributorships) in order to determine whether the defendant has market power in the second market.

We find equally unavailing Maris's reliance on our decision in <u>Graphic Products Distributors v. Itex Corp.</u>, 717 F.2d 1560 (11th Cir. 1983).  In that case, we also dealt with a claim concerning non-price, vertical restraints, in the form of territorial restrictions on distributors, and stated that "<u>Sylvania</u> places the competitive effect of particular vertical restraints at the center of the analysis under the rule of reason."  <u>Id.</u> at 1568.  We noted that as a threshold matter under the rule of reason, a plaintiff must establish that the defendant had market power in a well-defined relevant market, and that "[m]arket power is the ability to raise price significantly above the competitive level without losing all of one's business."  <u>Id.</u> at 1568-70.  We also recognized that "[m]arket share is frequently used in litigation

18

as a surrogate for market power." Id. 1570.

As Maris points out, in Graphic Products, we did talk in terms of the defendant's market share in the manufacture or sale of the end-products. Id. at 1570-71. However, as was the case in Sylvania, that was because the defined relevant market was the market for those end-products. Therefore, here again, this case does not provide any basis for imputing market power from one relevant market to another.[5]

_____

[5]It is true that Sylvania and Graphic Products do suggest that a manufacturer's market power in the end-product market does have an influence on the typical vertical restraint analysis. In the typical vertical restraint case, a plaintiff would prove that the defendant had market power in the relevant geographic and product market, and the relevant product market would usually consist primarily of the market for the manufacturer's end-product (which in this case would have been beer). The plaintiff would then prove anticompetitive effects in that market. Finally, there would have to be a systematic comparison of the negative effects which the challenged vertical restraint had on intrabrand competition in the market for the product with the positive effects of the restraint on competition in the interbrand market. Graphic Products, 717 F.2d at 1569-71. Sylvania and Graphic Products suggest that a manufacturer's market power in the end-product market has an influence on the typical vertical restraint analysis for the following reason. If a manufacturer with no market power imposed vertical restraints which increased the price of the end-product, then the manufacturer would necessarily experience a reduction in sales because consumers would substitute the lower priced products of its competitors. Thus the intrabrand restraint would have little effect on overall competition. Graphic Products, 717 F.2d at 1568-69 and n.11.

In this case, Maris did not pursue a typical vertical restraint claim. It did not claim an unreasonable restraint of trade with respect to the end-product, beer. Apparently concluding that it would not be able to show anticompetitive effects or

In an attempt to provide the type of "connection" that would justify the imputation of Anheuser-Busch's market share in the beer market to the market for distributorships, Maris alludes to economic literature bearing on this question. Maris states that its experts relied on "economic literature on vertical restraints which supports the determination of the defendant manufacturer's market power based on its market share in manufacturing." Maris's Opening Br., at p. 46. Other than the conclusory assertion of its experts, Maris provides no economic rationale suggesting that Anheuser-Busch's alleged market power in the beer market should endow it with power in the different market for the purchase and sale of equity ownership interests in beer distributorships. As Anheuser-Busch points out, Maris's expert testified that he could not identify a single non-price vertical restraint case in which a court had imputed market power from an entirely different market.

We have carefully reviewed Maris's arguments and its experts' reports. We

would not be able to show an unreasonable restraint of trade with respect to beer, Maris instead pursued a more atypical claim of restraint of trade in the different market of equity ownership interests in beer distributorships. The fact that Sylvania and Graphic Products suggest that market power with respect to the end-product has influence on the typical vertical restraint case, in which the relevant product market is the end-product, says little with respect to the very different question in this case of whether Anheuser-Busch's alleged market power in the end-product market for beer should be equated with market power in the different relevant market for equity ownership interests in beer distributorships.

conclude that Maris has not identified a valid economic reason why Anheuser-Busch's alleged market power in the beer market should create market power in the different market for the purchase and sale of equity ownership interests in beer distributorships. We also pressed Maris at oral argument in this regard, to no avail.[6]

The relevant market share evidence reveals that Anheuser-Busch possesses only one to three percent of the alleged relevant markets. Under these circumstances, it is clear that Anheuser-Busch's market share in the relevant market is inadequate, standing alone, to permit a finding of market power. See Retina Assocs. v. Southern Baptist Hospital of Fla., Inc., 105 F.3d 1376, 1834 (11th Cir. 1997) (holding that the defendants' 15% market share in the relevant market was insufficient as a matter of law to show market power for purposes of a §1 claim); L.A.P.D., Inc. v. General Electric Corp., 132 F.3d 402, 405 (11th Cir. 1997) (noting in context of § 1 claim that "[a] 5% or 10% or 15% share of a normal market . . . does not imply power to raise prices by curtailing output"). Therefore, unless Maris could show some other basis which would have permitted the jury to

---

[6]Both Maris and its experts do refer to Anheuser-Busch's contract power with respect to the distributors of Anheuser-Busch products. For the reasons indicated below, infra at Part III.A.3, we conclude that Anheuser-Busch's contract power does not give it market power.

find that Anheuser-Busch possessed market power in the relevant market, then the district court properly entered a directed verdict on this issue. We turn to Maris's efforts to make such a showing.

2. Aggregation of Market Share

In its second attempt to show that the district court erred by directing a verdict on the market power issue, Maris argues that even if we reject its argument that Anheuser-Busch's market share in the beer market may be imputed to the relevant market in this case, as we have, then we should still find that Anheuser-Busch had sufficient market share to show market power because we should aggregate the market share of all parties subject to Anheuser-Busch's distribution agreements containing the public ownership restriction. This approach would yield a market share somewhere around 48% in the market of ownership interests in beer distributors, and 100% of the submarket of Anheuser-Busch beer distributorships. We conclude that aggregation is inappropriate for purposes of assessing Anheuser-Busch's market share in the type of case before us.

In support of its aggregation argument, Maris primarily relies on the Fifth Circuit's opinion in Spectators' Communications Network, Inc. v. Colonial Country Club, 231 F.3d 1005 (5th Cir. 2000). In that case, the plaintiff sued one member of an alleged conspiracy to boycott the plaintiff. The district court found

22

that the defendant, who coincidentally was Anheuser-Busch, could not be held liable under § 1 because it individually did not have market power. Id. at 1014. The Fifth Circuit reversed after finding that the market share of all of the co-conspirators should have been aggregated in order to determine whether market power was present, and stated:

> [A]fter all, the reason for looking at market power is to determine whether the combination or conspiracy, not each individual conspirator, has the power to hurt competition in the relevant market.

Id. at 1014.

We conclude that Spectators is inapposite in that it deals with a conspiracy to boycott a business, rather than a vertical restraint imposed by a manufacturer on its distributors. If we were to aggregate the market share of all of Anheuser-Busch's distributors here, that would mean that aggregation of market share would always be required when reviewing vertical restraints. This approach would lose track of the fact that the vertical restriction was imposed by a single manufacturer seeking to regulate its distributors. Requiring aggregation also would make it much more difficult for any manufacturer with a significant market share in the market for its products to agree with its distributors with respect to vertical restrictions – which we know can be pro-competitive. When plaintiffs are able to show that a manufacturer's product constitutes a relevant submarket then

23

aggregation would yield a market share of 100%. We also believe that aggregation under these circumstances could threaten many franchise agreements, exclusive dealing agreements, and other arrangements traditionally reviewed under the rule of reason, by making market power seem to appear where it does not really exist.

But we need not concern ourselves with aggregation in the context of vertical restraints in general, the particular vertical restraint in the instant case is one that would appear to be of interest only to Anheuser-Busch. Maris has pointed to no evidence that other distributors have sought to prevent Maris from selling to a publically owned entity. Nor has Maris suggested any reason why other distributors might want to do so. Unlike Spectators, there is no agreement or conspiracy here that all Anheuser-Busch distributors will refuse to deal with Maris; no Anheuser-Busch distributor has agreed to do anything, or refrain from doing anything with respect to Maris. Instead, the agreement at issue only involves Maris and Anheuser-Busch.

We hold that it is not appropriate to aggregate Anheuser-Busch's market share with that of its distributors when determining whether Anheuser-Busch has market power in the relevant product market for equity ownership interests in beer distributorships for purposes of assessing a claim that the ban on public ownership constitutes an illegal vertical restraint.

3. Contract Power Versus Market Power

Finally, Maris argues that the directed verdict was improper because the district court based part of its reasoning on the fact that Anheuser-Busch's actions were an exercise in contract power, rather than in market power. Maris notes that §1 claims always involve a contract or agreement, but that fact does not insulate them from antitrust liability. Maris contends that the exercise of contract power, particularly where a plaintiff is "locked in" to the defendant's product or business, may violate the antitrust laws. Although Maris's argument has some intuitive appeal, in that Anheuser-Busch clearly had some power over Maris and its other distributors by virtue of the contractual provisions in its distribution agreements, we find the cases relied upon by Maris distinguishable, and agree with the district court that Anheuser-Busch's exercise of its contract power over Maris did not show that Anheuser-Busch had market power in the relevant market.

We begin by noting what the relevant question before us is not. It is not whether the exercise of contract power can be an antitrust violation. Contracts, and the exercise of contract power, may run afoul of the antitrust laws, as evidenced by the fact that §1 of the Sherman Act prohibits any "<u>contract</u>, combination . . ., or conspiracy, in restraint of trade." 15 U.S.C. §1 (emphasis added). Therefore, if the district court had held that Anheuser-Busch had not violated the antitrust laws

simply because its actions were pursuant to a contract, that would have been incorrect. Anticompetitive actions are not immunized by virtue of being memorialized in a contract.

The more interesting issue, and the one we think the district court was addressing when it spoke of contract power, is the relationship between contract power and market power. We believe, for the reasons that we discuss below, that the district court correctly recognized that, while a party who exercises contract power <u>may</u> have market power and <u>may</u> violate the antitrust laws under some circumstances, the mere existence and exercise of contract power does not show that a defendant had market power or violated the law. In other words, courts must attempt to ascertain a defendant's economic position in the relevant market, rather than its power pursuant to a particular contract, when considering whether a defendant has market power.

In arguing that the district court erred with respect to the contract power issue, Maris begins by pointing to the Supreme Court's decision in <u>Eastman Kodak v. Image Technical Servs.</u>, 504 U.S. 481, 112 S. Ct. 2072 (1992), the relevant part of which involved a tying claim. Although <u>Kodak</u> does not address the issue of when the exercise of contract power should be viewed as market power, it does address issues of market definition and market power in a context in which a

26

plaintiff is "locked in" to a relationship with a defendant. In Kodak, the plaintiffs had established triable issues of fact concerning the existence of a tying arrangement – i.e., whether Kodak parts and service for Kodak photocopy and micrographic equipment were distinct products subject to a tying analysis. Id. at 462-64, 112 S. Ct. at 2080. The Court noted that there was sufficient evidence that consumers viewed parts and service as separate products. Id. The Court also noted that parts for Kodak equipment were unique and were not interchangeable with other manufacturers' parts because only Kodak parts would work on Kodak machines. Id. at 456-57, 112 S. Ct. at 2077. Because of these factors, the Supreme Court held that a jury could find a tying arrangement between Kodak parts (the tying product), and Kodak service (the tied product). Id. at 463-64, 112 S. Ct. at 2080.

The Court then proceeded to consider whether there was sufficient evidence that Kodak had market power in the market for Kodak parts such that it could force unwanted purchases of the tied product (service for Kodak machines). Id. at 464, 112 S. Ct. at 2081. Kodak defended, arguing that the brisk competition in the original market for the photocopy and micrographic equipment would prevent it from having market power in the aftermarkets for service and parts, even though it had a dominant share of those markets – nearly 100% of the market for Kodak

27

parts.  Id. at 465-68, 112 S. Ct. at 2081-83.  Kodak argued that any attempt by it to charge supracompetitive prices for service or parts would inevitably lead to a reduction in sales of Kodak equipment because consumers would buy, or switch to, competing equipment.  Id. at 465-66, 112 S. Ct. at 2081-82.  Among the factors undermining this argument by Kodak, the Supreme Court pointed to the heavy initial cost for Kodak equipment.  Id. at 476-77, 112 S. Ct. at 2087.  The Court concluded that this high "switching cost" served to "lock in" existing customers, inhibiting their taking advantage of the brisk competition in the equipment market by switching to competitors' equipment.  Id.

Maris argues that the same is true when a plaintiff, such as itself, is "locked in" by a distribution agreement with a manufacturer.  Therefore, Maris urges us to find that this "lock-in" gave Anheuser Busch market power.

In addition to Kodak, Maris also seeks support from a case in which a franchisee brought antitrust claims against a franchisor challenging a provision in the franchise agreement, and a district court in our circuit found that the exercise of rights under a contract may run afoul of the antitrust laws.  See Collins v. Int'l. Dairy Queen, Inc., 939 F. Supp. 875 (M.D. Ga. 1996).  In that case, the court considered a tying claim brought by a franchisee, alleging that Dairy Queen's requirement that food and supplies be purchased from it constituted an unlawful

28

tying arrangement.  Dairy Queen argued that it could not be held liable for tying because the restraint was simply part of the franchise agreement and that any power over the franchisee resulted from that agreement rather than market power. Id. at 883.  The district court rejected this argument, relying on a variation of the "lock-in" concept from the Kodak decision:

> Plaintiffs have shown that Dairy Queen franchisees make significant initial investments in their franchises, which also provide them the option to open additional stores without paying another franchise fee. In addition, IDQ/ADQ can terminate or refuse to renew a franchise agreement if a franchisee fails to carry the full authorized menu of food products or does not meet quality standards. Because of the excessive costs and potential losses associated with purchasing another franchise, a Dairy Queen franchisee wishing to obtain products and supplies from alternative sources at lower costs may be locked in to the existing arrangement enjoyed by IDQ/ADQ. Based upon these cases, the court finds that plaintiffs have produced sufficient evidence of economic loss, overpriced products, and refusal to consider alternative sources of comparable products to preclude the entry of partial summary judgment based on the existence of a franchisor-franchisee relationship.

Id. at 883.  Therefore, the court held that the franchisee might have a viable claim against the franchisor, even though the restriction of which it complained was contained in the franchise agreement to which it had agreed.

In tension with the district court's holding in Collins, several of our sister circuits have cautioned against placing too much weight on the existence of contract power when defining relevant markets and determining whether

defendants possess market power. In a case involving facts similar to those in Collins, the Third Circuit reached a different result. See Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430 (3d Cir. 1997). In Queen City the court considered a §2 monopoly claim brought by a franchisee against a franchisor related to a requirement in the franchise agreement that the franchisee only purchase from the franchisor or approved suppliers. The franchisor, Domino's, argued that its:

> [P]ower to force plaintiffs to purchase ingredients and supplies from them stemmed not from the unique nature of the product or from its market share in the fast food franchise business, but from the franchise agreement. For that reason, plaintiffs' claims implicate principles of contract, and are not the concern of the antitrust laws.

Id. at 435 (citations and quotations omitted). The district court agreed and dismissed the plaintiffs' claim.

The Third Circuit agreed that the exercise of contract power resulting from the provisions of a franchise agreement did not raise antitrust concerns and that the franchisee failed to state a valid, relevant product market when it limited the alleged relevant market to parties who had entered into Domino's franchise agreements. Id. at 438. The court stated:[7]

------

[7]For the same reasons, the Queen City court rejected the plaintiff's definition of the relevant product market for the alleged tying product, thus rejecting the plaintiffs' tying claim. Id. at 442-43.

A court making a relevant market determination looks not to the contractual restraints assumed by a particular plaintiff when determining whether a product is interchangeable, but to the uses to which the product is put by consumers in general. Thus, the relevant inquiry here is not whether a Domino's franchisee may reasonably use both approved or non-approved products interchangeably without triggering liability for breach of contract, but whether pizza makers in general might use such products interchangeably. Clearly, they could. Were we to adopt plaintiffs' position that contractual restraints render otherwise identical products non-interchangeable for purposes of relevant market definition, any exclusive dealing arrangement, output or requirement contract, or franchise tying agreement would support a claim for violation of antitrust laws. Perhaps for this reason, no court has defined a relevant product market with reference to the particular contractual restraints of the plaintiff.

Id. In this regard, the Third Circuit also rejected a "lock-in" argument derived from Kodak, noting that the challenged provision in the franchise agreement was part of the deal when the franchisee entered the agreement, and holding that the crucial fact driving the determination of the relevant product market was that Domino's-approved supplies and ingredients were fully interchangeable with substitutes from other pizza suppliers. Id. at 439-40. The court recognized that contracts always restrain and affect a party's available choices, but that for purposes of determining a relevant product market, a court looks not to contractual restraints on a particular consumer, but rather to the uses to which the product is put by consumers in general and whether there are interchangeable substitutes.

The Fifth Circuit also took this approach when faced with a similar claim in

*United Farmers Agents Assoc., Inc. v. Farmers Ins. Exchange*, 89 F.3d 233 (5th Cir. 1996). The court stated that "[e]conomic power derived from contractual agreements such as franchises or in this case, the agents' contract with Farmers, 'has nothing to do with market power, ultimate consumers' welfare, or antitrust.'" Id. at 236. The court looked for the insurance company's market share in the market for insurance, rather than in a more specific market related to services required for the company's agents. Id. at 237.

Likewise, in *Hack v. President and Fellows of Yale College*, 237 F.3d 81 (2d Cir. 2000), the Second Circuit considered this issue in the context of a monopolization claim brought by students against their college based on the college's requirement that the students live in dormitories for their freshman and sophomore years. Citing Queen City, the court rejected the plaintiffs' market definition and affirmed dismissal of the claim, holding: "Economic power derived from contractual arrangements affecting a distinct class of consumers cannot serve as a basis for a monopolization claim." Id. at 85. Accord Double D Spotting Serv., Inc. v. Supervalu, Inc., 136 F.3d 554, 560-61 (8th Cir. 1998) (holding that market defined by one contract was not relevant market for antitrust purposes).

We agree with the approach taken by our sister circuits on this issue, and conclude that the district court correctly distinguished between contract power and

market power in determining that Anheuser-Busch was entitled to a directed verdict as to part of Maris's claim.[8]  The fact that Anheuser-Busch had considerable power over many aspects of Maris's business by virtue of the provisions of the contract to which they agreed (at least 3 separate times) reveals little about the issue of whether Anheuser-Busch had market power in the broader, relevant market for the purchase and sale of equity ownership interests in beer distributorships.  And there is no reason for us to believe that Anheuser-Busch's decision to exercise its rights under that agreement also were exercises of market power.

Our conclusion is consistent with the decision of the former Fifth Circuit in Kestenbaum v. Falstaff Brewing Corp., 514 F.2d 690 (5th Cir. 1975).[9]  In that case, a beer distributor brought a §1 Sherman Act claim challenging, among other things, the manufacturer's right to restrain the price at which the distributor could sell his distributorship.  Id. at 693.  We concluded that the district court erred by instructing the jury that it would be a per se violation of the antitrust laws for the

---

[8] Likewise, we conclude that the district court did not abuse its discretion by excluding certain evidence related to the market power issue.

[9] In Bonner v. City of Pritchard, 661 F.2d 1206 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.  Id. at 1209.

33

manufacturer to dictate the sale price of the plaintiff's distributorship.  Id.  at 695.

We held that any such restriction was subject to rule of reason review, and noted

that "[i]t is beyond question . . . that [a manufacturer] may legitimately restrict the

class of persons with whom it would agree to continue a . . . franchise, so long as

such restriction was not artificially employed to further some unlawful practice."

Id. at 696.  Based on this right, the Court continued:

> It logically follows that Falstaff has a right to restrict the sales price of
> one of its distributorship franchises to the reasonable value of that
> franchise in order to insure that the purchaser will have a chance to
> realize a reasonable return on his investment. Falstaff clearly has a
> strong interest in the financial vitality of a new franchisee. If the
> purchaser of a franchise makes a bad bargain when he buys, then he
> cannot give the distributorship the solid, concerned management
> which it must have to be successful for him and to enhance Falstaff's
> image and relative position in the market.

Id.  We also noted that this recognition of a manufacturer's interest in the identity

of its distributors and in the transfer of its distributorships had been recognized by

an earlier case in which we had "held that an automobile manufacturer possessed a

limited privilege to approve or disapprove a prospective purchaser since it would

deal with the purchaser in the future and would represent it to the public."  Id.

(citation omitted).  Although we did not discuss directly address the issue in

Kestenbaum, it is clear from our discussion that we did not believe that the

defendant's contractual power under its distribution agreement with the plaintiff

34

yielded market power.

Consistent with the holdings of the Third Circuit in Queen City, and the Fifth Circuit in United Farmers Agents, we believe that the Supreme Court decision in Kodak is distinguishable from the instant case. As noted in our discussion of Kodak above, that opinion did not address at all the issue in this case – i.e., whether contract power is the equivalent of market power for antitrust purposes. Moreover, the context of Kodak is entirely different from the instant context. There is no argument in this case that brisk competition in one market would prevent a defendant from having market power in another market, despite the defendant's dominant share in that market, because consumers would switch to competitors' substitute products in the competitive market. Unlike Kodak, Maris has not adduced "sufficient evidence of a tying arrangement," coupled with a high market share in the relevant product market for the tying product. Kodak, 504 U.S. at 464-65, 112 S. Ct. at 2080-81. Unlike Kodak, the defendant in the instant case has not defended against an otherwise viable antitrust claim (supported by sufficient evidence of the defendant's high market share in the relevant market) by arguing that market power was lacking, despite its high share of the market, because of the brisk competition in another market. It was because of this defense in Kodak that it became relevant whether or not customers could switch to

competitors' equipment. In this context, Anheuser- Busch has made no such

argument that an otherwise viable claim involving a defendant with a large share of

the relevant market is undermined by brisk competition in some other market.

Thus, the instant case does not involve the Kodak issue of whether or not

consumers can switch to a competitor.

Indeed, Maris has never argued, either in the district court or on appeal, that

high switching costs were relevant in the instant case. Nor does he explain how

such costs, even if proved, would be relevant to the issues before us.[10] For all these

reasons, we find Maris's reliance on Kodak to be misplaced.[11]

---

[10]We do not believe that switching costs – even if the argument had been presented and even if it were supported by evidence – are relevant to the issues before us. It may be that a distributor's ability to switch readily to another beer manufacturer (e.g. Miller or Coor's) might have offset the force of a viable antitrust claim supported by evidence of market power in the chosen relevant product submarket of ownership interests in Anheuser-Busch beer distributorships. However, that issue was never reached in the instant case because Maris failed to establish market power in the chosen relevant product markets and failed to establish any actual anticompetitive effect in those markets. Thus, Maris's claim failed without regard to whether or not there might have been high switching costs.

[11]It also appears that the context in which the district court in Collins invoked the Kodak concept of consumers being "locked in" by switching costs was a context more similar to Kodak than the context of the instant case. The franchisee in Collins had already established that the defendant had a large share of the market for the tying product; Dairy Queen enjoyed a 91% market share of the relevant product market of soft-serve ice cream. Indeed, the franchisee had adduced sufficient evidence to avoid summary judgment with respect to all of the elements of the tying claim, including market power in the tying product and

36

For the foregoing reasons, we follow the rationale of the Third Circuit in

Queen City and its progeny. We would be reluctant to adopt Maris's assertion that

contract power should automatically be equated with market power. To do so

would radically transform the accepted rule of reason analysis applicable to

vertical restraints. Maris's theory would place significant additional risks on such

legitimate business practices as exclusive dealing arrangements, output contracts

and franchise tying agreements. See Queen City, 124 F.3d at 438 ("Were we to

adopt plaintiff's position that contractual restraints render otherwise identical

products non-interchangeable for purposes of relevant market definition, any

exclusive dealing arrangement, output or requirement contract, or franchise tying

---

including substantial evidence of supracompetitive prices in the tied products and other evidence of coercion and anticompetitive effects. In defense, Dairy Queen relied upon Queen City "as authority for the proposition that an illegal tying arrangement cannot exist as a matter of law between a franchisor and its existing franchisees." Collins, 939 F. Supp. at 883. Although it is not absolutely clear from the opinion, Dairy Queen's argument apparently was an attempt to avoid having the case sent to the jury by asserting that the franchisee could always switch franchises and do business with another franchisor. Thus, it seems probable that the context in which the Collins court invoked the "lock-in" concept from Kodak was the same context involved in Kodak itself, and a very different context from the one in the instant case. In any event, it is clear that the Collins court did not expressly address or reject the issue which is crucial for the instant case, i.e., whether contract power equates to market power for antitrust purposes. However, to the extent that Collins supports the proposition that contract power is equated to market power for antitrust purposes, we reject Collins in favor of what we consider to be the more persuasive rationale of Queen City and its progeny.

agreement would support a claim for violation of antitrust laws."). Therefore, we affirm the district court's directed verdict in favor of Anheuser-Busch on the issue of market power.

B.  The District Court's Costs Award

Finally, Maris argues that the district court erred by awarding costs related to certain depositions taken by Anheuser-Busch that were not used at trial, and for costs associated with receiving expedited, daily transcripts of the trial proceedings. The district court held that the deposition costs should be taxed because all of the people Anheuser-Busch deposed had been identified by Maris on its witness list, and the depositions consequently were "taken within the proper bounds of discovery" and were necessary in light of the facts known to Anheuser-Busch at the time. With respect to the cost of expedited transcripts, the district court stated:

> According to the Defendant, such transcripts were necessary to the preparation of a defense, including witness examination, jury instructions, and closing arguments. The Defendant further contends that the transcripts were necessary to preserve oral rulings made by the Court and were indispensable because of the length and complexity of the case. The Court agrees that this was a lengthy and complex trial, and objections to the taxation of costs for expedited transcripts and trial transcripts are due to be overruled.

As we will explain, we conclude that the district court did not abuse its discretion in awarding the costs that it did.

We have recognized that we "will not disturb a costs award in the absence of

a clear abuse of discretion." Technical Resource Servs. v. Dornier Medical Sys., 134 F.3d 1458, 1468 (11th Cir. 1998). But the Supreme Court has held that a district court abuses its discretion if it awards costs pursuant to Fed. R. Civ. P. 54 in excess of those permitted by Congress under 28 U.S.C. §1920. Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 107 S. Ct. 2494 (1987). Expenses for "the stenographic transcript necessarily obtained for use in the case" are permitted by §1920.

Although some courts have not permitted the recovery of deposition costs where the depositions are for discovery, rather than for use in the case, see Hall v. Ohio Education Assoc., 984 F. Supp. 1144, 1146 (S. D. Ohio 1997), we have held that "[t]axation of deposition costs of witnesses on the losing party's witness list is reasonable because the listing of those witnesses indicated both that the plaintiff might need the deposition transcripts to cross-examine the witnesses, . . . and that the information those people had on the subject matter was not so irrelevant or so unimportant that their depositions were outside the bound of discovery." EEOC v. W & O, Inc., 213 F.3d 600, 621 (11th Cir. 2000). Therefore, because all of the depositions of which Maris complains were taken of people on Maris's witness list, the district court did not abuse its discretion by awarding these deposition-related costs.

Whether the costs for the expedited transcripts were properly taxed presents a closer question. In In re Nissan Antitrust Litigation, 577 F.2d 910 (5th Cir. 1978), our predecessor Court found that a district court had abused its discretion by permitting such costs, stating:

> As an individual portion of the costs, the trial court awarded costs for an expedited "daily" transcript requested solely by the defendants and to which the plaintiffs had not agreed. This additional expense was for the convenience of the defendants and was, by no means, indispensable. Therefore, this award was an abuse of discretion.

Id. at 918. See also Pan American Grain Manufacturing Co. v. Puerto Rico Ports Authority, 193 F.R.D. 26, 34 (D.P.R. 2000) (district court in Puerto Rico holding that the additional costs for an expedited transcript should not be permitted where a party "had ample representation during trial, and their attorneys could have taken day-to-day notes on the proceedings"). However, in reaching our conclusion in Nissan, we did not hold that the costs associated with expedited transcripts could never be deemed "necessary" by a district court. To the contrary, we expressly noted that expedited transcripts were not indispensable in that case.

Although we do not believe that the costs associated with expedited trial transcripts should be allowed as a matter of course, lest litigation costs be unnecessarily increased, the district court found that expedited transcripts were necessary in this case given its length and complexity. Under the circumstances,

40

we cannot say that the district court clearly abused its discretion by reaching this conclusion.

## IV.  CONCLUSION

For the reasons explained above, we conclude that the district court did not err in granting a directed verdict in Anheuser-Busch's favor on the issue of market power, that the district court did not abuse its discretion in awarding the costs that it did, and that the district court in all other respects is due to be affirmed.

AFFIRMED.